IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| MARILYN P.,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 5:21-cv-00029 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) |        United States Magistrate Judge |
|     Defendant.[2] | ) | |

Plaintiff Marilyn P. asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying her claim for a closed period of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. ECF No. 1. She argues that the Administrative Law Judge ("ALJ") made several errors in evaluating how Marilyn's severe fibromyalgia impacted her residual functional capacity ("RFC"), as well as in relying on a vocational expert's ("VE") flawed testimony, in concluding that Marilyn was not disabled from November 2014 through March 2016. Pl.'s Br. 1–3, 8–19, ECF No. 18. Marilyn asks the Court to reverse the decision and to remand with instructions to award benefits or, alternatively, to remand her claim for rehearing. *See id.* at 19–20.

After Marilyn filed her merits brief, the Commissioner moved to remand for rehearing under the fourth sentence of 42 U.S.C. § 405(g). Def.'s Mot. to Remand, ECF No. 19. The Commissioner agrees that reversal and remand is warranted in Marilyn's case, but she argues that a court-ordered award of benefits is not appropriate, in part because the ALJ should have an

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named Defendant in this action. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

1

"opportunity to obtain additional evidence" from a medical expert ("ME") and from another VE, and to "reassess [Marilyn's] fibromyalgia in accordance with" the regulations as part of a proper RFC determination. *See id.* at 1–2 (citing *Carr v. Kijakazi*, --- F. App' x ---, ---, 2022 WL 301540, at *4–5 (4th Cir. Feb. 1, 2022) (affirming district court's decision to remand for rehearing where ALJ failed to explain how he weighed conflicting evidence in assessing claimant's RFC, and instructing "that a court may exercise its discretion to direct the award of benefits as a remedy for [the ALJ's] failure to explain" only in the "unusual case" where it is "clear that there is no account on which substantial evidence would support a denial of coverage")). She also notes that Marilyn's case is distinguishable from those in which the Fourth Circuit has directed the Commissioner to award benefits to a claimant with "clearly" disabling fibromyalgia. *See id.* at 3–4 (citing *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020) (reversing and remanding for award of benefits where the "record as a whole clearly establishe[d] Arakas's disability" based on fibromyalgia and other severe impairments, the ALJ made "several" legal and factual errors in rejecting Arakas's symptoms and treating rheumatologist's medical opinion, the ALJ's decision "exhibit[ed] a pervasive misunderstanding of fibromyalgia," and Arakas had "been denied disability benefits and forced to undergo costly litigation for ten years[] solely because of the agency's errors" on prior federal-court remands)).

       Marilyn now opposes remand for rehearing. *See* Pl.'s Br. in Opp'n 1–8, ECF No. 20. In her view, this is not a case where the ALJ simply failed to explain how he weighed conflicting evidence when evaluating her fibromyalgia symptoms and RFC. *See id.* at 1–3 (citing *Carr*, 2022 WL 301540, at *4–5). The ALJ's articulated reasons for rejecting subjective evidence tending to support Marilyn's alleged functional limitations—i.e., her generally normal physical exams and the conservative nature of her treatment—were "clear from the decision," they were "just legally

2

erroneous" under binding Fourth Circuit precedent. *Id.* at 2; *see also id.* at 3; Pl.'s Br. 9 (citing *Arakas*, 983 F.3d at 95–98, 102). Marilyn also objects that two VEs have already testified in her case and "the extensive record before the Court makes clear that the ALJ's findings cannot be supported and that [Marilyn] is clearly entitled to benefits" for the closed period. *See* Pl.'s Br. in Opp'n 7–8. Thus, she asks the Court to reverse and remand for an award of benefits because a rehearing "would serve no useful purpose." *Id.* (quoting *Arakas*, 983 F.3d at 111).

A.  *Summary*

In September 2015, Marilyn filed for DIB alleging that she was disabled by fibromyalgia, attention deficit hyperactivity disorder ("ADHD"), osteoarthritis, and degenerative disc disease ("DDD"). *See* Administrative Record ("R.") 103–04, ECF No. 11-1. Marilyn alleged disability as of November 15, 2014, and she made one "unsuccessful work attempt" as a door-to-door salesperson before leaving the workforce in June 2015, *see* R. 104, 362–63, because of "fatigue [and] chronic pain," R. 512. *See also* R. 74–75, 77, 520, 530.

As of October 2014, Marilyn had "been tried on gabapentin, Lycia, [and] Cymbalta" for musculoskeletal pain. R. 543. She took Percocet throughout the relevant time, R. 522, 525, 531, 543, 577, 607, and occasionally requested an increased dosage, *see, e.g.*, R. 603 (Apr. 2016). Marilyn visited her primary-care provider, Donna Thacker, NP-C, every few months for medication management. *See* R. 517, 522–23, 428–29, 543, 602, 666–67. She consistently reported back pain, joint pain, and fatigue. R. 523, 532, 547, 605. Aside from "tenderness" around Marilyn's knees and elbows in October 2014, R. 548, NP Thacker's notes do not document any abnormalities on physical exams during the relevant period, R. 524 (Oct. 2015); R. 533 (June 2015); R. 606 (Apr. 2016); *see also* R. 144 ("The primary care records generally showed normal exams, though they were very basic."). In April 2016, NP Thacker noted that

3

Marilyn "continue[d] to decline offer to go to pain mgt – no insurance." R. 603; *see also* R. 617 ("She states she lost her insurance when she stopped working and is a self-pay patient." (June 2017)). That October, Marilyn told NP Thacker that her fibromyalgia pain was "worsening," making it "more difficult for her to use steps to [the] basement." R. 666 (Oct. 2016). She could no longer "bend/stoop [or] do yard work that she used to enjoy." *Id.*; *see also* R. 676 ("[F]ibromyalgia pain is worse. Still struggles with steps. Can't do yard work due to pain." (Apr. 2017)).

In January 2016, Marilyn told a Disability Determination Services ("DDS") interviewer that she had "intense" pain in her lower back and both knees. R. 107–08. She could cook, clean, and go grocery shopping, but she leaned on the cart because of pain. *Id.* Marilyn estimated that she could stand for about thirty minutes before needing to sit down, and she explained that she "must walk slow" because her "knees feel like they're going to pop out of [the] socket when walking." R. 108. Recent diagnostic images showed osteopenia in both knees, moderate osteoarthropathy in the left knee, and unspecified disc space narrowing in at L3-4, but no other abnormalities. *See* R. 592.

Marilyn saw Dale Carroll, M.D., for a consultative physical exam in late January 2016. She reported "a history of fibromyalgia" and "complain[ed] of diffuse muscle tenderness" with "persistent fatigue." R. 582; *see also* R. 577 ("She states that she was diagnosed with fibromyalgia in the mid-1990s."). She described her "typical daily activities" as "[h]omemaking tasks." R. 582; *see* R. 577 ("She does appear to be able to attend to activities of daily living without assistance. However, she states that the activities in which she is able to engage are limited as a function of ongoing pain."). On exam, Dr. Carroll noted "diffuse tenderness" in the lumbar spine, "tenderness at 16 of 18 [fibromyalgia] points," tenderness and crepitance in both

4

knees, and some limited passive range of motion in lower back, hips, and knees. R. 585–87. Marilyn could not do "a partial squat without assistance." R. 586. She also had "some difficulty" rising from a seated position and getting up and down from the supine position on the exam table, but she did not need help changing positions. *See* R. 585–87. Her neurophysical exam was otherwise normal, including full muscle strength and intact sensation, "no unsteadiness of gait," and no need for an assistive device. *Id.* She did "have some difficulty with ambulation secondary to knee pain," however. R. 590. Based on these exam findings, Dr. Carroll opined that Marilyn could lift/carry "up to 10 lbs frequently and 20 lbs occasionally"; sit "at least 6 hours," stand "at least 4 hours," and walk "at least 2 hours" during a normal workday with "usual breaks"; and could occasionally stoop, but could not crouch or crawl. R. 586.

In March 2016, DDS reviewing physician Richard Surrusco, M.D., opined that Marilyn's DDD and osteoarthrosis were "severe" medically determinable impairments ("MDI"), R. 110, causing some degree of demonstrable "pain with physical activity," R. 112. He also mentioned that Marilyn alleged disability due to fibromyalgia in addition to DDD and osteoarthritis, R. 109, but he did not find fibromyalgia to be an MDI that could reasonably be expected to cause the physical pain and other symptoms that Marilyn alleged, R. 110–11. Dr. Surrusco opined that, as of March 2016, Marilyn could lift/carry twenty pounds occasionally and ten pounds frequently; sit and stand and/or walk for about six hours each during an eight-hour workday; frequently balance; and occasionally climb, stoop, kneel, crouch, or crawl. R. 112–13. He interpreted Dr. Carroll's opinion as imposing "no limitations" on Marilyn's capacities for sitting, standing, and walking, which he noted "may be an[] underestimate" of her limitations given that she "does display pain with physical activity and there are degenerative changes in the spine." R. 112.

On reconsideration, a DDS analyst determined that the relevant period for Marilyn's DIB

5

claim was November 15, 2014, her alleged onset date ("AOD"), through December 31, 2015, her date last insured ("DLI").[3] *See* R. 126–27. In April 2016, DDS reviewer Nicolas Tulou, M.D., opined that Marilyn had three "severe" physical MDIs—fibromyalgia, DDD, and osteoarthritis—during this twelve-month period. *See* R. 127, 131. He agreed with Dr. Surrusco's opinion of Marilyn's capacities to lift/carry and sit during a normal workday, but he further restricted her to "4 hours" standing and/or walking with normal breaks.[4] R. 130 (citing "fibromyalgia, chronic knee pain with x-ray evidence of osteoarthritis, back pain with disc narrowing, mild obesity and related conditions"); *see* R. 124. It appears Dr. Tulou's opinion that Marilyn could stand/walk for only four hours, as opposed to about six hours, during an eight-hour workday would have resulted in a finding that Marilyn was "disabled" as of October 29, 2015. *See* R. 134–35.

Shortly after Dr. Tulou completed his assessment, the same DDS analyst "change[d]" Marilyn's DLI to March 31, 2016, R. 143, and conducted a second "reconsideration" review of her DIB claim for the period between her original AOD (November 15, 2014) and her new, later DLI. R. 143–52. In June 2016, Luc Vinh, M.D., opined that Marilyn could lift/carry twenty pounds occasionally and ten pounds frequently; sit and stand and/or walk for about six hours each during an eight-hour workday; frequently balance; and occasionally climb, stoop, kneel, crouch, or crawl. R. 147–48. He attributed these limitations to "fibromyalgia, chronic knee pain with x-ray evidence of osteoarthritis, back pain with disc narrowing, mild obesity and related conditions." R. 147. Marilyn's redetermined ability to stand/walk for six hours in an eight-hour workday resulted in a finding that she was "not disabled" before March 31, 2016. *See* R. 151–52.

---

[3] "To qualify for DIB, [Marilyn] must prove that she became disabled prior to the expiration of her insured status." *Johnson v. Barnhart*, 434 F.3d 650, 655–56 (4th Cir. 2005).

[4] The record suggests that Dr. Tulou originally proposed an RFC with "a 2 hour stand/walk" restriction, but then "altered the RFC" to incorporate the "four hour . . . stand/walk limitation" after the DDS analyst informed him that the two-hour restriction "may result in an allowance" of benefits. R. 124.

6

In September 2017, NP Thacker wrote two "To Whom It May Concern" letters supporting Marilyn's DIB claim. R. 658–59. In the first letter, NP Thacker noted that Marilyn was "diagnosed with fibromyalgia at a medical facility prior to becoming [her] patient" in 2012, R. 658; *see* R. 543 (Oct. 2014), and that Marilyn "consistently had symptoms of impaired sleep, fatigue, joint weakness, joint swelling, muscle weakness, and difficulty concentrating" while under NP Thacker's care until earlier in 2017, R. 658. She noted that Marilyn "tested positive at 18/20 trigger points for joint pain" and had been tried on "Gabapentin, Lyrica, and Cymbalta" without relief. *Id.*; *see* R. 603 ("States she went to disability [doctor] . . . had tender points at 18/20 spots for fibro."). She opined that Marilyn's "ability to perform both physical tasks (lifting/bending/pushing/pulling) and mental tasks [were] impaired by her diagnosis," but she did not identify any specific limitations. R. 658. In the second letter, dated September 15, 2017, NP Thacker clarified that Marilyn's "diagnosis of fibromyalgia limits her ability to sit or stand for any extended period greater than 2 hours." R. 659.

Later that month, Marilyn appeared with a non-attorney representative and testified at an administrative hearing before ALJ Karen Robinson. *See* R. 70–90. Marilyn testified that her husband, Kenneth, did "all" the cooking, shopping, laundry, and cleaning for her because she "start[ed] hurting really bad" after standing for ten minutes. R. 84; *accord* R. 414 ("The housework is all now put onto my shoulders including the laundry and grocery shopping and I still have my own work to do. . . . she can[']t stand on her feet for long enough to complete the dishes, vacuum our floors or take our dog outside for a walk."). She did not leave her bedroom most days. *See* R. 88. She could not pick something up off the floor because her left knee "want[ed] to come out of the socket and that really is painful." R. 84–85. Fibromyalgia primarily affected her "shoulders and arms," R. 85, but also impaired her lower back and legs, *see* R. 87.

7

She estimated that she could sit for at most 30 minutes and stand with a cane for "about ten or 15 minutes." R. 87. Marilyn noted that she had used the cane "for a couple of years" because her left knee "tr[ied] to come out of the socket all the time" and was "really stiff" whenever she stood up. R. 85. VE Sara Statz also testified at this hearing. *See* R. 90–100. She testified that Marilyn had past relevant work as a real estate agent and an insurance salesperson, both of which were typically performed at the "light" exertional level.[5] R. 91. In response to the ALJ's hypothetical questions, VE Statz testified that Marilyn could do the insurance salesperson job as generally performed if she were limited to "light" exertion work, R. 92–93, but could stand and walk "a total of four hours," or even "two hours[,] in an eight-hour workday," R. 93, 95. She also identified other "light" and "sedentary"[6] occupations in the economy that someone with Marilyn's vocational profile could perform if she were limited to "light jobs with two hours of standing and walking" in an eight-hour workday. *See* R. 95–96.

In March 2018, ALJ Robinson issued a written decision finding that Marilyn's "severe combination of . . . degenerative disc disease, osteopenia, degenerative joint disease, fibromyalgia[,] and obesity," R. 159, was not disabling "at any time from November 15, 2014, the alleged onset date, through March 31, 2016, the date last insured," R. 170. *See generally* R.

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "The full range of light work" requires the ability to "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). Aside from the amounts of weight lifted and carried, "[t]he major difference between sedentary and light work is that most light jobs" require standing or walking for "most of the workday." SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983). Light work typically requires six hours standing/walking during an eight-hour day, SSR 83-10, 1983 WL 31251, at *5–6, while sedentary work only requires about two hours standing/walking and sitting for the remaining six hours, *see Neal*, 2010 WL 1759582, at *2.

156–70. Marilyn asked the Appeals Council to review this decision on grounds that the ALJ's appointment violated the U.S. Constitution. *See* R. 177. In December 2019, the Appeals Council vacated ALJ Robinson's decision and remanded Marilyn's case to a different ALJ, whose appointment did not have the same constitutional defect, with instructions to offer Marilyn "an opportunity for a hearing, take any further action needed to complete the administrative record[,] and issue a new decision." *Id.*

In April 2020, Marilyn appeared with counsel and testified by telephone at a hearing before ALJ Brian Crockett. *See* R. 36–69. Her husband still did all the shopping and household chores. R. 61. She could sit, stand, and/or walk for about ten minute each before needing to switch positions or rest. R. 60–61. VE Larry Ostrowski also testified at this hearing. He "could not say within a degree of professional certainty that an individual limited [to] standing and walking four hours could in every instance perform th[e] job" that Marilyn did when she worked as an insurance salesperson. R. 65 ("The insurance sales agent, . . . the job that she did particularly does require going out and visiting clients. There may be quite a bit of walking involved, maybe not so much long-term walking, but, you know, periods of intense walking."). VE Ostrowski later added that "in general," any job "in sales would generally require having to stand more than, or walk four to -- four hours per workday." R. 67.

ALJ Crockett issued an unfavorable decision on June 2, 2020. R. 15–28. He found that Marilyn's DDD, osteopenia, DJD, fibromyalgia, and obesity were each severe MDIs between November 15, 2014, and March 31, 2016, R. 18, but they did not meet or medically equal the relevant listings, R. 20. Next, ALJ Crockett found that Marilyn retained the RFC to perform "light" work except "walking and standing for 4 hours in an 8 hour day; frequent balancing; occasional climbing, stooping, kneeling, crouching and crawling; and . . . occasional exposure to

9

hazards." R. 20–21. He explained that he restricted her to four hours standing/walking—versus Dr. Surrusco's and Dr. Vinh's proposed six-hour limit—during the workday to accommodate the "osteoarthritis in her knee and her tenderness in her back and multiple tender points." R. 25. He rejected Dr. Carroll's and NP Thacker's opinions that Marilyn "was limited to only 2 hours of walking" or standing as inconsistent with exams showing "a normal gait, normal strength in her extremities[,] and no need for an assistive device for ambulation." R. 24 ("Again, prior to the date last insured, the claimant had normal gait, so there is no reason to believe she had significant limitations in her abilities in standing and walking.").

As part of his RFC assessment, ALJ Crockett found that Marilyn's fibromyalgia and other MDIs "could reasonably be expected to cause [her] alleged symptoms," but that her statements describing the disabling "intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" for three reasons. R. 22. First, physical exams revealed normal gait, muscle strength, sensation, reflexes, and range of motion, and she was "noted on repeated examinations to just have some tenderness in her back and tender points consistent with a diagnosis of fibromyalgia." R. 23. There was "no evidence that she had any gait difficulties" or needed "an assistive device for ambulation" during the relevant time. *Id.* Second, and relatedly, he found that Marilyn's testimony at the first ALJ hearing in September 2017 about having used "a cane to ambulate for the past couple of years" was "inconsistent with" treatment records, which did "not mention" any assistive device and showed that Marilyn "never mentioned falling, having any weakness/strength deficits in her lower extremities, or balance problems to any of her treatment providers." *Id.* Third, ALJ Crockett found that Marilyn's treatment was "generally routine, conservative[,] and unremarkable," given that she "was primarily just treated for her pain with

10

medications prescribed by her nurse practitioner and was not referred to a neurologist, orthopedist[,] or rheumatologist." *Id.* She was referred to pain management in April 2017, more than a year after her DLI, but she did not receive any treatment, in part because "she refused offered nonnarcotic interventional procedures." *Id.*; *see* R. 624 ("We will not be able to provide her any opioid prescriptions. Nonnarcotic and interventional procedures were offered however patient is not interested."). He did not mention that in April 2016 Marilyn "continue[d] to decline" NP Thacker's referral to pain management because she did not have insurance. R. 603; *see Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (noting that a "claimant may not be penalized for failing to seek treatment she cannot afford").

Based on his RFC finding and VE Statz's testimony at the September 2017 hearing, ALJ Crockett concluded that Marilyn was not disabled "at any time from November 15, 2014, the alleged onset date, through March 31, 2016, the date last insured" because Marilyn still could have performed her "past relevant work as an insurance agent and real estate agent" as those occupations are "generally performed" in the national economy. R. 25. Alternatively, he found that Marilyn could have performed other "light, unskilled" occupations (routing clerk, ticket seller, marker) that offered a significant number of jobs in the national economy. R. 27.

*B.    Discussion*

The Commissioner seeks a "sentence four" remand in this case. Def.'s Mot. to Remand 1 (citing 42 U.S.C. § 405(g)). The fourth sentence of § 405(g) authorizes federal courts to enter "judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The court's only role in reviewing such decisions is to determine whether the Commissioner's "findings are supported by substantial evidence" in the claimant's record "and whether the correct law was

11

applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). "A necessary predicate to engaging" in this review "is a record of the basis for the ALJ's ruling." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). "The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Id.* "If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

Remand is also appropriate where the ALJ failed to apply, or clearly misapplied, "the pertinent legal requirements to the record evidence," *id.*, in explaining the basis of his decision to deny benefits. *See, e.g.*, *Janel G. v. Kijakazi*, No. 5:20cv18, 2021 WL 3076407, at *9–11 (W.D. Va. July 21, 2021) (reversing and remanding where ALJ improperly relied on claimant's generally unremarkable physical exams and the "conservative" nature of her treatment in rejecting statements describing disabling fibromyalgia symptoms); *cf. Tinker v. Barnhart*, 214 F. Supp. 2d 1144, 1147, 1154–55 (N.D. Okla. 2002) (noting that "[t]he Commissioner's decision will be reversed when she uses the wrong legal standard or fails to clearly demonstrate reliance on the correct legal standards," and remanding case for rehearing where ALJ applied the wrong legal standard in denying benefits). There are exceptions, of course, such as cases where the claimant's otherwise fully developed "record does not contain substantial evidence to support a decision denying [benefits] under the correct legal standard," *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974), "the delay involved in repeated [federal-court] remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court," *Ellis v. Colvin*, No. 5:13cv43, 2014 WL 2862703, at *17 (W.D. Va. June 24, 2014)

12

(quoting *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 800 (E.D. Wis. 2004)). *See Arakas*, 983 F.3d at 112 (collecting cases); *Radford*, 734 F.3d at 295 (citing *Breeden*, 493 F.3d at 1011–12). The district court has discretion to choose the appropriate remedy. *Carr*, 2022 WL 301540, at *4–5; *Radford*, 734 F.3d at 295; *McKinney v. Colvin*, 111 F. Supp. 3d 663, 666 (E.D.N.C. 2015).

\*

In *Arakas*, the Fourth Circuit held that "ALJs may not rely on objective medical evidence (or lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." 983 F.3d at 97. This is because "[o]bjective indicators such as normal clinical [examinations] and laboratory results simply have no relevance to the severity, persistence, or limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the disease." *Id.* On the contrary, "physical examinations of patients with fibromyalgia will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 96 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003) (cleaned up)). "If considered at all, such evidence—along with consistent trigger-point findings—should be treated as evidence *substantiating* the claimant's impairment." *Id.* at 97–98. The *Arakas* Court also explained that "the unique characteristics of fibromyalgia" must inform how an ALJ evaluates other evidence that ALJs typically consider when assessing the intensity, persistence, and limiting effects of a claimant's symptoms, such as the nature of her treatment or the frequency with which she reported symptoms to her medical providers. *See id.* at 101–02 (citing SSR 12-2p, 2012 WL 3104869 (July 25, 2012)). For example, a fibromyalgia patient who takes appropriate prescription medications to manage her symptoms "cannot be faulted 'for failing to pursue non-conservative treatment options where none exist.'" *Id.* at 102

13

(quoting *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)).

As in *Arakas*, ALJ Crockett's evaluation of the intensity, persistence, and limiting effects of Marilyn's fibromyalgia symptoms "reflects 'a pervasive misunderstanding of the disease.'" *Id.* at 97 (quoting *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). He rejected Dr. Carroll's and NP Thacker's opinions that Marilyn "was limited to only 2 hours of walking" or standing solely because those opinions were "inconsistent with" physical exams showing "a normal gait, normal strength in her extremities[,] and no need for an assistive device for ambulation." R. 24 ("Again, prior to the date last insured, the claimant had normal gait, so there is no reason to believe she had significant limitations in her abilities in standing and walking."). *Cf. Arakas*, 983 F.3d at 106 (explaining that ALJ made "several errors" in giving "little weight" to treating rheumatologist's medical opinion, including by ignoring "ample evidence of consistent trigger-point findings" and "insist[ing] on objective medical evidence" that fibromyalgia "does not produce"). ALJ Crockett's decision also "indicates that the lack of [abnormal] objective medical evidence was his chief, if not definitive, reason for discounting [both Marilyn's] complaints," *Arakas*, 983 F.3d at 97, and her husband's "casual observation[s]" of her day-to-day pain and limitations, R. 25. *See, e.g.*, R. 23 ("Specifically, she has been noted on repeated examinations to have just some tenderness in her back and tender points consistent with a diagnosis of fibromyalgia. There is no evidence that she had any gait difficulties . . . prior to her [DLI]. She was also noted to have normal strength, sensation and reflexes in her extremities[.]"). ALJ Crockett's only other reason for discounting Marilyn's complaints—that her treatment was "generally routine, conservative and unremarkable" because she was "just treated for her pain with medications prescribed by her nurse practitioner," R. 23—is insufficient as a matter of law because such treatment is "wholly consistent with how fibromyalgia is treated generally," *Arakas*, 983 F.3d at 102.

14

Unlike in *Arakas*, however, Marilyn's record does not contain "undisputed evidence" that "compels [the court] to conclude that [she] was unable to sustain full-time work—eight hours a day, five days a week—during the relevant period," 983 F.3d at 111 (footnotes omitted). For example, all three physicians who offered medical opinions on how Marilyn's fibromyalgia impacted her capacities to sit and stand concluded that Marilyn could sit for about six hours, and stand for at least four hours, during a normal eight-hour workday. *See* R. 130 (Tulou); R. 147 (Vinh); R. 586 (Carroll). NP Thacker, on the other hand, opined that Marilyn's "diagnosis of fibromyalgia limits her ability to sit or stand for any extended period greater than 2 hours." R. 659. While NP Thacker's opinion cannot be entitled to "controlling weight" like the treating rheumatologist's medical opinion in *Arakas*, 983 F.3d at 106–08; *see* 20 C.F.R. § 404.1527(f), ALJ Crockett should not have discounted NP Thacker's opinion solely because Marilyn had "normal gait" and "no neurological or extremity abnormalities on repeated examinations," R. 24. Rather, as Marilyn points out, he should have evaluated these conflicting opinions using any pertinent regulatory factors, including the source's treating or examining relationship with Marilyn, how well the source explained his or her opinion, and whether the opinion was consistent with the record as a whole. *See* Pl.'s Br. 14 (citing 20 C.F.R. § 404.1527(c)); Pl.'s Br. in Opp'n 3–5 (citing 20 C.F.R. § 404.1527(c), (f)). This Court cannot "engage[] in an analysis that the ALJ should have done in the first instance." *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Moreover, ALJ Crockett did not make any factual findings "about [Marilyn's] daily activities" before her DLI or consider all the relevant evidence about the efficacy (or lack thereof) of her pain medications or the "nature and frequency of her attempts to obtain medical treatment for [her] symptoms." *See* Pl.'s Br. 10 (citing SSR 12-2p, 2012 WL 3104869, at *5

15

("Evaluation of Fibromyalgia")). Marilyn's record contains inconsistent evidence on those points as well. In January 2016, for example, she told a DDS interviewer and two examining sources that she could cook, clean, and grocery shop without much help before her DLI. *See* R. 107–08, 577, 582. Months later, Marilyn told NP Thacker that "worsening" fibromyalgia pain was "mak[ing] it more difficult for her use steps to [the] basement," R. 666 (Oct. 2016), and she could not "do yard work" because of worsening pain, *id.*; R. 676 (Apr. 2017). In September 2017 and January 2020, Marilyn testified that her husband did all the housework and shopping because she essentially stayed in her bedroom all day. R. 84–85, 87–88 (Sept. 2017); R. 60–61 (Jan. 2020). The Court cannot "engage in a fact-finding expedition" or speculate about how ALJ Crockett might have weighed this evidence, *Fox*, 632 F. App'x at 755, had he evaluated Marilyn's fibromyalgia symptoms under the correct legal standard, *Janel G.*, 2021 WL 3076407, at *11.

Finally, while Marilyn filed her DIB claim nearly seven years ago, the Commissioner's decision to deny benefits is on its first appeal to federal court and, as such, the agency has not "displayed obduracy in complying with the law as set down by the court" on a prior remand, *Ellis*, 2014 WL 2862703, at *17. *Cf. Felicia T. v. Saul*, No. 4:20cv33, 2021 WL 2910206, at *6 (W.D. Va. July 12, 2021) (declining to award benefits on a post-remand appeal where ALJ failed to explain material conflicts in RFC assessment, even though claim had been pending for almost nine years); *Ellis*, 2014 WL 2862703, at *17 (declining to award benefits on a post-remand appeal where ALJ failed to explain material conflicts in the RFC assessment, even though claim had been pending for almost eight years and facts presented "a close case, particularly given the small amount of benefits involved").

C.     *Conclusion*

I take no position on whether Marilyn is entitled to disability benefits from November 2014 through March 2016. On remand, the ALJ must consider and apply the correct legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Marilyn cannot prove that she was disabled based on the medical evidence alone, provide a logical link between the evidence the ALJ found credible and the RFC determination.

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's motion to remand, ECF No. 19, **REVERSE** the Commissioner's final decision, **REMAND** the matter for rehearing under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: July 21, 2022

Joel C. Hoppe
United States Magistrate Judge